## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:20-CR-00313 |
| v. | (Chief Judge Brann) |
| MITCHELL OCKER-MULLEN, | |
| Defendant. | |

## MEMORANDUM OPINION

### JUNE 4, 2024

## I.     BACKGROUND

In 2020, Mitchell Ocker-Mullen was indicted for being a felon in possession of explosives, in violation of 18 U.S.C. § 842(i), receipt of explosive materials by a non-licensee and non-permittee, in violation of 18 U.S.C. § 842(a)(3)(A), and possession of unregistered firearms—specifically five hand grenades—in violation of 26 U.S.C. § 5861(b).[1] Ocker-Mullen thereafter pled guilty, pursuant to a written plea agreement, to having been in possession of unregistered firearms.[2]

The Court ultimately accepted the guilty plea, and a Presentence Report ("PSR") was prepared.[3] The PSR described the underlying crime in some detail, noting that the investigation into Ocker-Mullen began after the owner of a firearms

---

[1]   Doc. 1.
[2]   Docs. 26, 30.
[3]   Doc. 34.

store contacted the police regarding Ocker-Mullen's suspicious purchase and his inquiries regarding hand grenades and firearm components.[4]

Because Ocker-Mullen was at the time on probation for a prior felony conviction, this contact elicited an interview of Ocker-Mullen by the relevant probation officer.[5] During the interview, the probation officer observed drug paraphernalia and firearm parts.[6] Consequently, police searched Ocker-Mullen's residence as vehicle and recovered:

> drug paraphernalia, rifle lower receivers, steel armor plates, bolt carriers, Hodgdon Pyrodex powder, two pairs of tactical boots, tactical go-bags, grenade clips/spoons, a Glock 31-round 9mm magazine, a Glock 17 33-round magazine, grenade spoon, pins, igniter, three laptops, five cellular telephones, one large silver body suit, two Halloween costumes, a lower receiver drill guideline, and an assault rifle trigger assembly.[7]

Following that search, police arrested Ocker-Mullen on state criminal charges.[8]

Days later, the Federal Bureau of Investigation ("FBI") obtained a search warrant for Ocker-Mullen's electronic devices and seized:

> numerous short videos and photographs, including a four-second video of Mitchell Ocker-Mullen manipulating a grenade in his Volkswagen vehicle and a photograph of a grenade inside a drainage pipe. The grenade in the drainage pipe was capped with a green firework-style fuse coming out of the top. The photograph was captioned "I am scared." In another video, a person known to Mitchell Ocker-Mullen and the Federal Grand Jury (confidential witness) filmed a Brink's

---

[4]   Doc. 34 at 4-5.

[5]   *Id.* at 5.

[6]   *Id.*

[7]   *Id.*

[8]   *Id.*

truck making a delivery at First National Bank on October 6, 2020. A 16-second video was located . . . which had music attached, panned to reveal a tabletop with the following items: knife, fork, scissors, paint, plyers, the top portion of a grenade (priming device, spoon, and pin), a bowl with a black powder inside, and a black bottle with an orange label. The label on the black bottle identified the substances as 16 ounces of Hodgdon Pyrodex muzzle loading propellant. The video also showed a grenade body being held by a right hand covered in a skeleton tattoo similar to tattoos on Mitchell Ocker-Mullen. The hand positioned the grenade body to reveal a capped bottom, which is normally open when sold as an inert grenade, and a corked top with a green rope like material protruding out. Investigators recognized the rope material to resemble green firework type fusing.[9]

The FBI investigation revealed that Ocker-Mullen and law enforcement's confidential witness ("CW") had conducted "surveillance at jewelry stores, local banks, and Brink's armor trucks to obtain a pattern of travel and business hours."[10] The CW further revealed that "Ocker-Mullen purchased numerous firearm components with the intention of altering, and or creating rifles for him and the confidential witness in order to carry out robberies to the jewelry store and local banks."[11]

Importantly, the CW informed the FBI that:

the confidential witness went with Mitchell Ocker-Mullen to a densely wooded area near Centre Hall to set off the improvised grenades created by Mitchell Ocker-Mullen. Mitchell Ocker-Mullen filled the grenade bodies with Hodg[d]on Pyrodex Powder (dark energetic material), sealed the lower part of the grenade body with a cork, and sealed the upper part of the grenade with another piece of cork which had a hobby fuse in the middle. He colored the grenade body orange and drew two

---

[9]   *Id.* at 5-6.
[10]  *Id.* at 7.
[11]  *Id.*

dots on top and middle, with a white color line resembling a face that is smiling. Mitchell Ocker-Mullen and the confidential witness made their way inside the wooded area, following a culvert pipe uphill towards a ledge. Mitchell Ocker-Mullen set off the improvised grenade by lighting the fuse and throwing each grenade over the cliff towards the brushes. He threw all five of the grenade devices, but only one out of the five detonated.[12]

The FBI and a bomb technician then went to the location described by the CW and recovered "five improvised grenades created by Mitchell Ocker-Mullen" that "contained a dark energetic material, corks on both sides of the grenade body, and a hobby fuse found in between one of the corks."[13] "The five improvised grenades were also painted orange, which was identified as belonging to Mitchell Ocker-Mullen, based on the seized electronic devices and statements made by the confidential witness."[14] An FBI bomb technician confirmed that the grenades "met the definition of a firearm or destructive device under 26 U.S.C. §§ 5845(f) and 5661(b)," contained explosive powdered manufactured outside of Pennsylvania, and were not registered by Ocker-Mullen.[15]

The PSR calculated a total offense level of 23 and a criminal history category III, resulting in a Sentencing Guidelines range of 57 to 71 months' imprisonment.[16] Notably, one of Ocker-Mullen's prior convictions was a felony conviction for

---

[12] *Id.*
[13] *Id.* at 8.
[14] *Id.*
[15] *Id.* at 8-9.
[16] *Id.* at 10-13, 18.

criminal attempted forgery and possession of an instrument of crime.[17] This Court ultimately imposed a sentence of 57 months' imprisonment.[18]

Ocker-Mullen did not appeal his conviction or sentence but, instead, filed this timely 28 U.S.C. § 2255 motion in late 2023.[19] In his motion, Ocker-Mullen argues that, based on *New York State Rifle & Pistol Association, Inc. v. Bruen*[20] and *Range v. Attorney General United States of America*,[21] his conviction is in violation of the Second Amendment to the United States Constitution.[22] The Government responds that Ocker-Mullen's motion is without merit because: (1) is it barred by a collateral appeal waiver contained in the plea agreement; (2) it is procedurally defaulted; (3) his conduct and conviction falls outside the protections of the Second Amendment; and (4) prohibiting individuals such as Ocker-Mullen from possessing hand grenades falls within the historical traditions of this Nation.[23]

Ocker-Mullen has filed a reply brief, rendering this matter ripe for disposition.[24] For the following reasons, the Court will deny Ocker-Mullen's motion.

---

[17]  *Id.* at 12-13.
[18]  Doc. 51.
[19]  Doc. 54.
[20]  597 U.S. 1 (2022).
[21]  69 F.4th 96 (3d Cir. 2023) (en banc).
[22]  Docs. 54, 58.
[23]  Doc. 63.
[24]  Doc. 64.

## II.    DISCUSSION

### A.    The Second Amendment as Applied to Ocker-Mullen[25]

The Second Amendment to the United States Constitution reads "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[26] In 2008, the Supreme Court of the United States in *District of Columbia v. Heller* determined "that the Second Amendment conferred an individual right to keep and bear arms" unconnected to militia service.[27]

However, the Supreme Court emphasized that "the right was not unlimited, just as the First Amendment's right of free speech was not" and, therefore, it did "not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*."[28] To emphasize that point, the Supreme Court stated:

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and

---

[25]   The Court notes that the Government raises two meritorious procedural defenses to Ocker-Mullen's § 2255 motion: that it is prohibited by the terms of the collateral appeal waiver contained in the plea agreement, and his claim is procedurally defaulted. Doc. 63 at 15-16 & 21 n.1. However, because Ocker-Mullen's claim fails on the merits, the Court addresses the substance of his claim below, rather than dismissing the motion on those procedural grounds.

[26]   U.S. Const. amend. II.

[27]   554 U.S. 570, 595 (2008).

[28]   *Id.*

qualifications on the commercial sale of arms.[29]

The Supreme Court further qualified the right expressed in the Second Amendment when it noted "that the sorts of weapons protected were those in common use at the time . . . We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"[30]

That decision has led the United States Court of Appeals for the Third Circuit to consistently state that, if a law does not impose "a burden on conduct falling within the scope of the Second Amendment's guarantee," then the Second Amendment simply is not implicated, and no further analysis is needed.[31] Similarly, the Supreme Court in its recent decision *New York State Rifle & Pistol Association, Inc. v. Bruen* reiterated that the Second Amendment protects only "the possession and use of weapons that are 'in common use at the time'" and, therefore, a law prohibiting or regulating the possession of a firearm does not trigger constitutional protection unless it regulates "weapons 'in common use' today."[32]

---

[29] *Id.* at 626-27.

[30] *Id.* at 627 (internal citation and quotation marks omitted).

[31] *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*, 822 F.3d 136, 141 (3d Cir. 2016). *See also Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101 (3d Cir. 2023) ("After *Bruen*, we must first decide whether the text of the Second Amendment applies to a person and his proposed conduct").

[32] 597 U.S. 1, 21 & 31-32 (2022) (quoting *Heller*, 554 U.S. at 627). *See also Caetano v. Massachusetts*, 577 U.S. 411, 416-17 (2016) (observing "that the Second Amendment . . . guarantees [only] the right to carry weapons 'typically possessed by law-abiding citizens for lawful purposes'" (Alito, J., concurring)).

Here, the statute under which Ocker-Mullen was convicted, as applied to him, does not violate the Second Amendment because it falls outside of the protections of that Amendment. Importantly, Ocker-Mullen was convicted for failing to register five hand grenades.[33] It is beyond obvious that hand grenades are extremely dangerous explosive devices that are not in common use today, nor have they ever been in common use.

The United States Court of Appeals for the Ninth Circuit has recognized that hand grenades "are even more dangerous and unusual than machine guns . . . are less common than either short-barreled shotguns or machine guns," and "therefore are not protected by the Second Amendment."[34] Similarly, a panel of the United States Court of Appeals for the Fourth Circuit has explained that "[h]and grenades, sawed-off shotguns and fully automatic 'M–16 rifles and the like' are unusual weapons that fall outside of the Second Amendment because they are not in common use or typically possessed by the citizenry.'"[35] Judge Manion on the United States Court of Appeals for the Seventh Circuit in a dissenting opinion similarly stated, by way of example, that:

> because hand grenades have never been commonly used by law-abiding citizens for lawful purposes, it matters not whether the regulation is an ordinance prohibiting ownership of such weapons, a licensing scheme impeding access to them, or a regulation setting conditions on their

---

[33] *See* Doc. 1 at 3-4; Doc. 26 at 1.

[34] *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009).

[35] *Kolbe v. Hogan*, 813 F.3d 160, 177 (4th Cir. 2016) (quoting *Heller,* 554 U.S. at 627), *vacated on other grounds on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017).

manufacture or sale: the Second Amendment does not apply to such inquiry because the type of weapon is not covered by it.[36]

And, while it has not addressed the constitutionality of regulations on hand grenades, the Supreme Court has noted that hand grenades "are highly dangerous offensive weapons" and, as such, "one would hardly be surprised to learn that possession of hand grenades is not an innocent act."[37] The Supreme Court later iterated that not "all guns [can] be compared to hand grenades" and "the fact remains that there is a long tradition of widespread lawful gun ownership by private individuals in this country. Such a tradition [does] not apply to the possession of hand grenades."[38] Collectively, these cases state the obvious: hand grenades are not commonly owned and therefore fall outside the protection of the Second Amendment.

Few, if any, individuals own hand grenades for self-defense or any other lawful purpose. They cannot be used for hunting or sport and, because of their wide, undirected explosive pattern, they are not practical or desirable for defensive purposes in one's home. Rather, hand grenades are imprecise explosives meant to cause widespread devastation when directed at enemy combatants. In short, they are military weapons, not arms in ordinary use among the public. As hand grenades are

---

[36] *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 414 n.1 (7th Cir. 2015) (Manion, J. dissenting).

[37] *United States v. Freed*, 401 U.S. 601, 609 (1971).

[38] *Staples v. United States*, 511 U.S. 600, 610 (1994).

not "weapons 'in common use' today,"[39] they fall outside the protections of the Second Amendment, Ocker-Mullen's conviction remains constitutional, and his motion must be denied.[40]

### B.    Certificate of Appealability

Because this Court will deny Ocker-Mullen's § 2255 motion, this decision will not be appealable unless this Court or a circuit justice issues a certificate of appealability.[41] A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right."[42] To satisfy this standard Ocker-Mullen must demonstrate that reasonable jurists would find that the Court's assessment of the constitutional claim is debatable or wrong.[43] This Court finds that Ocker-Mullen has not met this burden, and therefore declines to issue a certificate of appealability.

---

[39]  *Bruen*, 597 U.S. at 31-32 (quoting *Heller*, 554 U.S. at 627).

[40]  *Cf. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*, 822 F.3d at 141-43 (holding "that the de facto ban on machine guns found in [18 U.S.C.] § 922(o) does not impose a burden on conduct falling within the scope of the Second Amendment" because "[t]hey are not in common use for lawful purposes . . . [and] are also exceedingly dangerous weapons").

[41]  28 U.S.C. § 2253(c)(1)(B).

[42]  *Id.* § 2253(c)(2).

[43]  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003).

### III.   CONCLUSION

For the foregoing reasons, the Court concludes that Ocker-Mullen's conduct falls outside of the protections offered by the Second Amendment, and his 28 U.S.C. § 2255 motion will be denied. The Court will also deny a certificate of appealability.

An appropriate Order follows.


BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge